# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### MACON DIVISION

| | |
|---|---|
| **IESHA GILLIAN,**[1] | |
| *Plaintiff,* | **CIVIL ACTION NO.** |
| **v.** | **5:22-cv-00383-TES** |
| **DG DISTRIBUTION SOUTHEAST LLC,** | |
| *Defendant.* | |

## ORDER GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

On October 31, 2022, Plaintiff Iesha Gillan filed suit, alleging that Defendant DG Distribution Southeast LLC,[2] her former employer, discriminated against her because of her pregnancy and disability in violation of Title VII of the Civil Rights Act, the Pregnancy Discrimination Act ("PDA") and the Americans with Disabilities Act ("ADA"). [Doc. 1, pp. 1–2]. The parties completed discovery on April 30, 2024, and now, Defendant moves for summary judgment. [Doc. 31]; *see* [Doc. 28, p. 1]. Because Defendant has met its burden in showing that there is no dispute of material fact as to essential elements of Plaintiff's claims for pregnancy discrimination (Count

---

[1] It appears from the record that the correct spelling of Plaintiff's name is "Gillan," not "Gillian." *See* [Doc. 31-3, Gillan Depo., p. 24:22-24]; [Doc. 33-4, Gillan Depo., ¶ 1]. Despite the text in Plaintiff's Complaint (and as a result, how the case was docketed), the Court will refer to Gillan in the body of this Order by her correctly spelled name. *See* [Doc. 1, p. 1].

[2] Defendant is a wholly owned distributor for Dollar General stores.

I), disability and perceived-disability discrimination (Counts II and III, respectively),

and retaliation (Count IV), the Court **GRANTS** Defendant's Motion for Summary

Judgment [Doc. 31].

## SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment "if the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to

a judgment as a matter of law." Fed. R. Civ. P. 56(c). As to issues for which the movant

would bear the burden of proof at trial, the "movant must affirmatively show the

absence of a genuine issue of material fact and support its motion with credible

evidence demonstrating that no reasonable jury could find for the non-moving party on

all of the essential elements of its case." *Landolfi v. City of Melbourne*, 515 F. App'x 832,

834 (11th Cir. 2013) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.

1993)). As to issues for which the non-movant would bear the burden of proof at trial,

the movant may (1) simply point out an absence of evidence to support the non-moving

party's case or (2) provide "affirmative evidence demonstrating that the [non-movant]

will be unable to prove its case at trial." *United States v. Four Parcels of Real Prop. in*

*Greene & Tuscaloosa Ctys.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (citing *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant satisfies its burden, the burden shifts to the non-movant, who must "go beyond the pleadings and present *affirmative evidence* to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick*, 2 F.3d at 1115–17) (emphasis added). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the [non-moving] party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1162 (11th Cir. 2006). Finally, the Court must view the evidence and draw all reasonable inferences in the light most favorable to the non-movant—here, Plaintiff Gillan. *See United States v. Flanders*, 752 F.3d 1317, 1330 (11th Cir. 2014).

## BACKGROUND

In July 2020, Defendant hired Plaintiff Gillan as a General Warehouse Worker ("GWW") in the "repack area" of its distribution center in Jackson, Georgia, a large facility containing merchandise stacked on shelving four stories high. [Doc. 32-3, Gillan Decl., ¶¶ 4–5]; [Doc. 31-3, Gillan Depo., pp. 19:15-22, 27:12-20, 29:3-8, 37:4-7, 67:1-18]. To paint the full picture, the Court will begin by explaining what the GWW job generally entails before delving into Plaintiff's individual circumstances and the events giving rise to the cause of action.

GWWs distribute the products within the distribution center, filling retail stores' orders by retrieving (i.e., "picking") the merchandise and placing it on conveyers. [Doc. 31-3, Gillan Depo., pp. 18:14-19, 20:4-21]. The distribution center must put out a specific amount of merchandise every day. [*Id*. at p. 73:2-7]. The GWW Job Description explicitly states that the job entails "[c]ontinuous lifting of merchandise up to 65 pounds on a regular basis, and occasional team lifting of merchandise up to 85lbs." [Doc. 31-4]. It also includes "continuous walking, including long distances and up and down stairs," as well as "[s]tanding, bending, stooping, squatting, kneeling, reaching, and pushing and pulling using hands and/or arms *on a repetitive basis* above and below the shoulder level." [*Id*. (emphasis added)]. The job also "may" require "work[ing] at heights up to 30 feet above ground" and "work[ing] continuously up to 12 hours." [*Id*.].

Plaintiff knew from her experience working there, however, that the job didn't *always* involve lifting massive, heavy products. *See* [Doc. 32-1, p. 9:6-10]. Nor, in her experience, did it ever require working 12-hour shifts. [Doc. 32-3, Gillan Decl., ¶¶ 19–20]. Rather, she only worked 10-hour shifts Monday through Friday and eight-hour shifts on two Sundays per month. [*Id*.]. Further, as to the heavy-lifting, the record shows that there were four floors of the repack area of the distribution center in which Plaintiff

worked.[3] [Doc. 32-2, Gillan Depo., p. 26:19-22]; [Doc. 31-3, Gillan Depo., p. 67:1-22]. The third floor involved lifting only items weighing less than 35 pounds, whereas the other floors involved picking heavier items. [Doc. 32-2, Gillan Depo., pp. 25:12-14, 29:18–30:23]. The GWWs, including Plaintiff, often rotated between floors depending on where they were needed. [*Id*. at p. 29:8-17]. For example, after working on the first floor for approximately the first month of her employment, Plaintiff was assigned exclusively to the second floor—although she helped on other floors when needed. [Doc. 32-3, Gillan Decl., ¶¶ 23–24]. Sometimes, when there wasn't enough work for all the GWWs on a given day, the extra GWWs would be given the choice between taking unpaid Voluntary Time Off ("VTO") or accepting work assignments other than picking, such as cleaning the areas outside repack. [*Id*. at ¶¶ 17–18]. Additionally, on about four or five occasions during her tenure, but prior to her pregnancy, Defendant assigned Plaintiff to work in the recycling area for her entire shift—a task which involved lifting lightweight, empty boxes (only up to her chest level). [*Id*. at ¶ 25].

Now, having provided that background on Plaintiff's job, the Court can move onto the events giving rise to this cause of action. It began in February 2021, when

---

[3] There were other areas of the distribution center other than repack. [Doc. 32-2, p. 27:4-11]. For example, there were "forklift jobs" and a "full case" department. [*Id*.]. She also stated that "sanitation" was another job, but Defendant's attorney got her to clarify that sanitation was a job under another contractor, i.e., a different employer. [*Id*. at pp. 27:15–28:5]. Plaintiff explained, however, that she was able to work sometimes by keeping her workstation clean. [*Id*. pp. 27:15–28:21]. She never worked in any other departments, just on different floors of the repack department. [*Id*. at p. 29:1-2].

Plaintiff learned she was pregnant with her seventh child.[4] [Doc. 32-3, Gillan Decl., ¶¶ 6–7]. On February 24, 2021, Plaintiff left work after telling a supervisor, Latonya Roblejo, that she wasn't feeling well.[5] [*Id*. at pp. 62:3–63:9]. Instead of going home, however, Plaintiff went to the emergency room as a precaution. [*Id*.]. She discovered she had high blood pressure and received a note from the hospital saying she could return to work on February 27, 2021 (a Saturday). [*Id*. at pp. 63:8-20, 64:15–65:3].

Before she returned to work, Plaintiff scheduled her first doctor visit for the pregnancy for February 26, 2021. [Doc. 32-3, Gillan Decl., ¶ 8]. In her Declaration, Plaintiff stated testified that although her doctor, Dr. Louis Mameli, didn't include an official diagnosis in the medical records from that visit, it was then that he first noticed her elevated blood pressure and diagnosed her with a pregnancy-related medical

---

[4] Previously, Plaintiff had suffered a miscarriage with another child and had taken medical leave for it in August of 2020. [Doc. 31-3, Gillan Depo., p. 30:4-13]. She also had several other personal-leave absences from work due to taking care of her children throughout her tenure, and she took another medical leave in September and October of 2020 for reasons she does not recall. *See* [*id*. at pp. 30:14–31:22].

[5] Ryan Phillips was Plaintiff's direct supervisor, who reported to Roblejo. *See* [Doc. 32-2, Gillan Depo., p. 15:10-20]; [Doc. 31-7, Phillips Depo., p. 3:9-24]. So, Roblejo was the supervisor of Plaintiff's supervisor.

condition known as preeclampsia.[6] [*Id*. at ¶¶ 8–9]; *see* [*id*. at ¶ 28]. Dr. Mameli provided

her with a note which said (1) that she shouldn't lift over 35 pounds or do excessive

lifting over her head, (2) that she should rest 30 minutes during her lunch break with

her feet elevated, and (3) that her shift shouldn't be longer than eight hours. [Doc. 32-4].

Although the note did not explicitly say she was pregnant, it is very clearly from an OB-

GYN, and it contains an "EDC" (Estimated Date of Confinement) of September 27,

2021—about eight months after the appointment. *See* [*id*.].

     In accordance with the emergency room's work excuse, Plaintiff returned to

work on Monday, March 1, 2021. [Doc. 31-3, Gillan Depo., p. 65:4-7]. Plaintiff sent Dr.

Mameli's note to Roblejo over the weekend before she reported to work.[7] [Doc. 32-2,

Gillan Depo., pp. 55:11–56:10]. Upon arrival, Plaintiff told Roblejo that she could work

but just couldn't lift more than 35 pounds, but Roblejo told her to go home and request

---

[6] According to her Declaration, Plaintiff understood that Dr. Mameli didn't include the preeclampsia diagnosis in the February 26 records because doctors typically confirm that diagnosis closer to 20 weeks into pregnancy. [Doc. 32-3, Gillan Decl., ¶ 9]. To corroborate that account, Plaintiff included her medical records from March 31, 2021, indicating that she had a "history" of preeclampsia—apparently meaning that she had preeclampsia prior to March 31. [*Id*. at ¶ 10]; *see* [*id*. at ¶¶ 11–12]; [Doc. 31-10, p. 1]. Although Plaintiff's testimony on this point is hearsay, it could be made admissible at trial by having the doctor testify. *See* Fed. R. Evid. 801(c). Therefore, the Court can consider Plaintiff's testimony when ruling on this Motion for Summary Judgment. *See* Fed. R. Civ. P. 56(c)(2). That said, because nothing in the record indicates that Plaintiff informed anyone at work about her preeclampsia diagnosis after her February doctor visit (she just told them about her pregnancy), whether she has a history of preeclampsia is not material to any issue on summary judgment. Moreover, Defendant did not object to this testimony on hearsay grounds. *See generally* [Doc. 31].

[7] Plaintiff also gave the doctor's note to Ryan Phillips, her direct supervisor, who referred her to Human Resources ("HR"). [Doc. 32-2, Gillan Depo., p. 15:10-20]; [Doc. 31-7, Phillips Depo., p. 3:9-24]. Plaintiff then dropped the doctor's note off at HR. [Doc. 31-3, Gillan Depo., pp. 91:5–92:12].

medical leave. *See* [Doc. 31-9, pp. 1-2]; [Doc. 31-3, Gillan Depo., pp. 99:16-19, 100:5-8]. She did so, and her request was pending until March 25, 2021. [Doc. 31-3, Gillan Depo., p. 81:11-22].

Before she left that day, however, Plaintiff spoke to a coworker, a young African-American woman who was visibly far into her pregnancy ("Pregnant Coworker"), and who told Plaintiff that she had the same restrictions as Plaintiff and had been working only on the third floor since she had been pregnant. [Doc. 31-3, Gillan Depo., pp. 99:12-15, 100:9–101:6]. Plaintiff also learned of another coworker, a tall, middle-aged, African-American woman, who had incurred a leg injury that put her in a cast ("Injured Coworker"). [*Id*. at pp. 102:11–104:3]. Defendant allowed the Injured Coworker to pick exclusively on the third floor (despite that she previously worked on the first floor) and sweep around the workstation. [*Id*. at pp. 105:5-7, 107:10-13]. Plaintiff admitted in her deposition that she didn't know any details about the length of the Injured Coworker's restrictions or her specific restrictions. [*Id*. at pp. 104:14-24, 108:13-17].

After she was sent home on March 1, 2024, Plaintiff applied for leave through Defendant's third-party leave administrator. [*Id*. at pp. 105:16–106:10]. While her request was pending, Dr. Mameli filled out an Employee's Own Serious Health Condition form for Gillan, which clarified that her condition was "pregnancy" and restated that it would last nine months and require no overhead lifting, no lifting over 35 pounds, no shifts longer than eight hours, and 30-minute rest breaks at lunch. [Doc.

31-3, Gillan Depo., p. 56:2-24]. It further specified that she would also need six weeks of leave after her September 27 due date. [*Id.* at 56:10-13].

Internal emails from around this time—specifically March 18, 2021—show employees of Defendant stating that they were "unable to accommodate [Plaintiff's] restrictions by allowing [her] to work" and would instead "accommodate [her] with an available leave program." [Doc. 33-8, p. 1]. But on March 25, 2021, Matrix approved Plaintiff for leave for a limited period, granting her the remainder of her available leave under the company's policy, until March 31, 2021.[8] [*Id.* at pp. 105:16–106:10]; [Doc. 31-11, p. 10].

Plaintiff returned to work on April 1, 2021, but Roblejo sent her home again. [Doc. 32-2, Gillan Depo., pp. 55:18–56:10]. On April 15, 2021, the Human Resources Shared Services Leave Administration sent Plaintiff a letter telling her she had exhausted her leave on April 1. [Doc. 31-3, Gillan Depo., p. 85:15-24]. At that point, Plaintiff called and asked if she could return to work. [*Id.* at p. 86:6-22]. She doesn't remember what they said in response, but Plaintiff ultimately did not return to work. On or about May 10, 2021, Defendant officially terminated her for failure to return from

---

[8] Matrix denied Plaintiff's request insofar as she requested leave under the Family and Medical Leave Act because she had not worked for Defendant for 12 months or more. [Doc. 31-3, Gillan Depo., p. 77:17-22]. Her request for leave—when processed under Defendant's medical leave of absence policy, rather than the Family and Medical Leave Act—was approved. [*Id.* at pp. 78:23–79:7]. At the time of receiving these determinations on her request, Plaintiff was originally confused as to why she was getting a denial and approval at the same time, but by the time of her deposition, she understood that it was because her request was analyzed under both the Family and Medical Leave Act and Defendant's internal medical leave policy. *See* [*id.* at pp. 79:5–80:1].

leave but told her that she was eligible for rehire. *See* [Doc. 33-9, p. 1]; [Doc. 31-13, p. 2].

Plaintiff feels she was wrongfully terminated because she could have worked exclusively on the third floor for the duration of her pregnancy, and Defendant simply didn't accommodate her medical restrictions. [Doc. 31-3, Gillan Depo., p. 88:12-20]. Plaintiff admitted in her deposition that if she were to leave two hours earlier or come in two hours late—as her restriction would have required—her duties would fall upon her coworkers. [*Id*. at p. 74:17-23]. That said, Plaintiff also stated at another point in her deposition that although it was her intention to follow most of the doctor's restrictions, she would have worked the full 10 hours. [*Id*. at p. 83:21-24]. Additionally, she admitted if she were only to lift small items under 35 pounds, her coworkers would need to pick up more heavier items in her stead.[9] [*Id*. at pp. 73:13–74:16].

## DISCUSSION

### 1. Pregnancy Discrimination

Plaintiff brings her first claim under the PDA, alleging that Defendant discriminated against her because she was pregnant (Count I). [Doc. 1, ¶¶ 32–37]. The Court finds that Plaintiff has failed to establish a prima facie case of pregnancy discrimination. However, even if she had, she nonetheless lacks insufficient evidence

---

[9] In all fairness to Plaintiff, she contended at that point in her deposition that "[t]hey actually go by the label, like how many picks you have picked," not "by pounds." [Doc. 31-3, Gillan Depo., p. 74:5-7]. In other words, it seems she is saying that the job does not require that employees each lift a certain number of pounds per day but rather, a certain number of overall packages. *See* [*id*.].

to permit a reasonable jury to infer discriminatory intent or find a convincing mosaic of discrimination because of her pregnancy. Accordingly, Defendants are entitled to summary judgment, and the Court **DISMISSES** Plaintiff's PDA claim (Count I).

"The PDA provides that the prohibition against sex-based employment discrimination in § 703(a) of Title VII, 42 U.S.C. § 2000e–2(a), applies with equal force to discrimination on the basis of 'pregnancy, childbirth, or related medical conditions.'" *Armindo v. Padlocker, Inc.*, 209 F.3d 1319, 1320 (11th Cir. 2000) (citing 42 U.S.C. § 2000e(k)). In other words, the PDA aims to ensure that pregnant women are treated the same as non-pregnant people. *See* 42 U.S.C. § 2000e(k) ("[W]omen affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work.").

In its Motion for Summary Judgment, Defendant points to several cases from within the Eleventh Circuit that rely on the Supreme Court's burden-shifting framework from *McDonnell Douglas Corp. v. Green*, arguing that Plaintiff has failed to establish a prima facie case of discrimination and therefore, it is entitled to summary judgment. *See* 411 U.S. 792 (1973), *holding modified by Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993); *see, e.g.*, *Durham v. Rural/Metro Corp.*, 955 F.3d 1279, 1285 (11th Cir. 2020); *Key v. Cent. Georgia Kidney Specialists, P.C.*, 2020 WL 7053293, at *4 (M.D. Ga. Oct. 28, 2020). Under this framework, a plaintiff can establish a prima facie case of

pregnancy discrimination is by showing that: "(1) she is a member of the protected class; (2) she requested accommodation; (3) the employer refused her request; and (4) the employer nonetheless accommodated others "similar in their ability or inability to work." *Durham*, 955 F.3d at 1285. Then, even if the plaintiff succeeds in establishing a prima facie case, the defendant still has the chance to shift the burden back to the plaintiff by putting forth a legitimate non-discriminatory reason for denying her request. *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255 (1981). This burden is a burden of production, not of proof, and is, therefore, "exceedingly light." *Walker v. NationsBank of Fla. N.A.*, 53 F.3d 1548, 1556 (11th Cir. 1995). "The defendant need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 255.

"Once the employer identifies a legitimate, nondiscriminatory reason for its decision, the presumption of discrimination disappears, and the burden shifts back to the plaintiff 'to demonstrate that the proffered reason was not the true reason for the employment decision.'" *Holland v. Gee*, 677 F.3d 1047, 1054–56 (11th Cir. 2012) (quoting *Burdine*, 450 U.S. at 256). "At this stage, the plaintiff's burden of rebutting the employer's proffered reasons 'merges with the [plaintiff's] ultimate burden of persuading [the finder of fact] that she has been the victim of intentional discrimination.'" *Id*. (quoting *Burdine*, 450 U.S. at 256).

However, as Plaintiff points out, establishing a *McDonnell Douglas* prima facie

case is only one way in which a plaintiff can survive summary judgment.[10] *See* [Doc. 33, p. 5 (citing *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011))]; *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 941 (11th Cir. 2023) (rejecting the defendant's argument that it was entitled to summary judgment because the plaintiff did not present sufficient comparators). "[E]stablishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith*, 644 F.3d at 1328; *see also Mohammed v. Jacksonville Hospitalists, P.A.*, 712 F. App'x 872, 878 n.5, 880 (11th Cir. 2017) (applying the convincing mosaic standard in a pregnancy discrimination case). Rather, even if a plaintiff cannot establish the *McDonnell Douglas* elements, she can survive summary judgment if she can otherwise present a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."[11] *Smith*, 644 F.3d at 1327–28 (internal citations omitted).

---

[10] To be fair to Defendant, "parties (and sometimes courts) miss this fundamental point and wrongly treat the prima facie case as a substantive standard of liability." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 945 (11th Cir. 2023). Although the phrase "prima facie case" ordinarily describes a plaintiff's burden of producing evidence to permit a trier of fact to infer a fact at issue, the phrase has a special meaning within the context of *McDonnell Douglas*. *Id*. In that context, it—quite paradoxically—means to establish a rebuttable presumption of discrimination. *Id*. Also in fairness to Defendant, Defendant's Reply acknowledges that the convincing-mosaic standard is another way a plaintiff can survive summary judgment. *See* [Doc. 34, pp. 2–4].

[11] Notably, in a case before this Court that Defendant cites, the Court made clear that *McDonnell Douglas* was one of "three ways" in which a plaintiff could survive summary judgment. *Key v. Cent. Georgia Kidney Specialists, P.C.*, 2020 WL 7053293, at *4 (M.D. Ga. Oct. 28, 2020).

Therefore, even if Plaintiff fails to establish, for example, a sufficient comparator, that wouldn't necessarily "doom [her] case"—even if the existence of a comparator would be a probative factor. *Id.*; *see also Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) (listing probative factors). That said, it *would* doom her case if she failed to establish that she was a member of a protected class or that she suffered an adverse employment action. *See Tynes*, 88 F.4th at 946. Those are essential substantive elements. Other "[e]vidence that is likely to be probative is 'evidence that demonstrates, among other things, . . . suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, . . . [or] pretext.'" *Id.* at *13 n.2 (quoting *Jenkins*, 26 F.4th at 1250).

As for Plaintiff's claim for pregnancy discrimination, Defendant does not dispute that she was pregnant—and therefore, in the class that the PDA protects. *See* [Doc. 31-2, pp. 8–11]; [Doc. 31-1, ¶ 4]. Although Defendant denied her specific accommodations request,[12] according to Defendant, it did so for a legitimate non-discriminatory reason, and Plaintiff has not produced evidence of discriminatory intent to establish pretext. [*Id.* at pp. 10–11].

But let's first turn to whether Plaintiff establishes a prima facie case. Question

---

[12] However, Defendant contends Plaintiff cannot meet the third element because although Defendant denied her *specific* accommodation request (to lift no more than 35 pounds and work no more than eight hours per day for seven to eight more months), it gave her *an* accommodation—namely, allowing her to take the rest of her leave under company policy. *See* [Doc. 31-2, p. 9 n.3].

number one: Can Plaintiff establish sufficient comparators? Plaintiff testified about

two purported comparators: (1) a pregnant coworker with the same restrictions as her

("Pregnant Coworker") and (2) a coworker with a leg injury that required her to be in

a cast ("Injured Coworker"). According to Plaintiff, Defendant allowed both

coworkers to work exclusively on the third floor for at least a few months at a time.

[Doc. 32-2, Gillan Depo., pp. 41:6-16, 54:1-3, 55:5-15].

The Court easily determines that the Pregnant Coworker cannot be a valid

comparator. The Eleventh Circuit settled that question nearly 25 years ago when it

held that other pregnant employees are not acceptable comparators in disparate-

treatment suits alleging pregnancy discrimination. Why? Because the PDA does not

require an employer to provide special accommodations to its pregnant employees.

*See Spivey v. Beverly Enterprises, Inc.*, 196 F.3d 1309, 1312 (11th Cir. 1999), *abrogated on

other grounds by Young v. United Parcel Serv., Inc.*, 575 U.S. 206 (2015) ("The PDA does

not require that employers give preferential treatment to pregnant employees.");

*Garcia v. Woman's Hosp. of Texas*, 97 F.3d 810, 813 (5th Cir. 1996) ("The PDA does not

mandate preferential treatment for pregnant women."); *California Fed. Sav. & Loan

Ass'n v. Guerra*, 479 U.S. 272, 286 (1987) (holding that the PDA does not mandate

preferential treatment for pregnant employees). Rather, the PDA only ensures that

pregnant employees are given the same opportunities and benefits as non-pregnant

employees who are similarly limited in their ability to work. *See Byrd v. Lakeshore*

*Hosp.*, 30 F.3d 1380, 1382 (11th Cir. 1994) ("It is today settled precedent that the PDA and Title VII are violated when pregnant employees are denied privileges afforded nonpregnant temporarily disabled employees.").

If an employee's pregnancy prevents her from fulfilling the duties of her position, her employer is not obligated to treat her any differently than it would treat a non-pregnant employee who is in the same position. *See Armindo*, 209 F.3d at 1320 ("[T]he Pregnancy Discrimination Act . . . is not violated by an employer who fires an employee for excessive absences, unless the employer overlooks the comparable absences of non-pregnant employees."); *see also Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996) ("[T]he Pregnancy Discrimination Act does not require that employers make accommodations for their pregnant workers; 'employers can treat pregnant women as badly as they treat similarly affected but nonpregnant employees.'") (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 738 (7th Cir. 1994). Again, Plaintiff's Pregnant Coworker simply can't serve as a valid comparator. In all candor, the fact that Defendant accommodated the Pregnant Coworker—but not Plaintiff—strongly undermines Plaintiff's case for discriminatory intent or a convincing mosaic by showing that pregnancy alone could not have been the reason Defendant denied Plaintiff's accommodation request.[13]

---

[13] Notably, amid pointed questions from Defendant's attorney, Plaintiff even admitted in her deposition that she couldn't have been treated differently because of her pregnancy since Defendant accommodated the Pregnant Coworker. [Doc. 31-3, Gillan Depo., p. 101:10-21].

The Injured Coworker, on the other hand, *could* serve as evidence supporting both the fourth element of Plaintiff's *McDonnell Douglas* prima facie case—*if* she is similarly situated to Plaintiff "in all material respects." *See Lewis v. City of Union City*, 918 F.3d 1213, 1218 (11th Cir. 2019). The existence of the Injured Coworker shows that Defendant could potentially accommodate employees in the manner Plaintiff sought to be accommodated (namely, by allowing them to work exclusively on the third floor for some amount of time), but simply chose not to accommodate Plaintiff in that same manner. *See also Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1317 (11th Cir. 1994) (holding that "the PDA does not require employers to extend any benefit to pregnant women that they do not already provide to other disabled employees").

However, Plaintiff's evidence as to how similar the Injured Coworker is to Plaintiff to failed to prove that she is a legally sufficient comparator. *See* [Doc. 31-2, p. 9]. To be sure, Plaintiff testified that she first saw the Injured Coworker working on the third floor (where there were only lighter items to lift) while injured in late January.[14] [Doc. 32-2, Gillan Depo., pp. 58:21–59:7, 61:2-4]. Then, when she came into work on March 1, 2021, Plaintiff saw the Injured Coworker still there on the third floor and sweeping around the workstation. [*Id.* at p. 55:5-18]. When she returned on

---

[14] Plaintiff also seems to indicate that the Injured Coworker worked on the third floor prior to her injury. [Doc. 32-2, p. 57:10-13]. But at another point, Plaintiff testified that Defendant "moved her off her original floor" toward the end of January "when we discovered she was hurt." [*Id.* at pp. 58:24–59:2]. Despite this inconsistency, the Court, drawing all reasonable inferences in favor of Plaintiff, will assume the Injured Coworker was moved to the third floor after she got hurt. *See United States v. Flanders*, 752 F.3d 1317, 1330 (11th Cir. 2014).

April 1, 2021, the Injured Coworker was still there doing the same tasks. [*Id.*]. So, drawing all reasonable inferences in favor of Plaintiff, the Court presumes the Injured Coworker worked on the third floor for three months. *See* [*id.*]; *Flanders*, 752 F.3d at 1330.

Even assuming Injured Coworker worked exclusively on the third floor for those three months, that is still a far cry from the seven additional months Plaintiff wanted. Second, Plaintiff offered no evidence about the Injured Coworker's actual medical restrictions—nothing as to her specific weight limit, any need for breaks, how long she would be in a cast, any restriction as to only lift lighter loads, or the maximum hours she could work on a particular shift. This dearth of comparator-specific evidence simply doesn't allow the Court to determine that the Injured Coworker is similar to Plaintiff in "all material respects." Accordingly, the Court finds that Plaintiff has not established a prima facie case under *McDonnell Douglas*.

But, even if the Court assumed that Plaintiff had made out a prima facie case under *McDonnell Douglas*, the Court nonetheless agrees with Defendant that it had a legitimate, non-discriminatory reason for denying Plaintiff's accommodations request, which Plaintiff cannot rebut, and Plaintiff does not otherwise paint a convincing mosaic of pregnancy discrimination.

Even if Plaintiff had established a prima facie case, Defendant still has the chance to shift the burden back to Plaintiff by putting forth a legitimate non-

discriminatory reason for denying her request. *Burdine*, 450 U.S. at 255. Here, pointing to the GWW Job Description, in conjunction with Plaintiff's restrictions, Defendant contends that Plaintiff could not perform "the basic qualifications of a GWW position," including lifting more than 35 pounds, lifting overhead, and working 10-to-12-hour shifts. [Doc. 31-2, p. 10]. Again, this is a burden of production, not of proof, that is "exceedingly light." *Walker*, 53 F.3d at 1556. Thus, simply by proffering these reasons, Defendant has met its burden and "eliminated the presumption of discrimination." *See Chapman v. AI Transp.*, 229 F.3d 1012, 1028 (11th Cir. 2000).

Now, the burden shifts back to Plaintiff to come forward with sufficient evidence to permit a reasonable factfinder to find that Defendant's proffered reasons were pretextual and a coverup for its true discriminatory motives. *Id*. At this stage in the *McDonnell Douglas* process, the question merges with the overarching standard of whether Defendant intentionally discriminated against Plaintiff. *Holland*, 677 F.3d. at 1056 (first citing *Burdine*, 450 U.S. at 256; and then citing *Smith*, 644 F.3d at 1326). "Put another way, the issue is whether there is 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination.'" *Id.* (quoting *Smith*, 644 F.3d at 1328); *see Lewis*, 918 F.3d at 1221 ("[S]hould the defendant carry its burden, the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that 'merges with the [plaintiff's] ultimate burden of persuading the [factfinder] that she has been the

victim of intentional discrimination.'") (quoting *Holifield v. Reno*, 115 F.3d 1555 (11th Cir. 1997)). Especially because the Pregnant Coworker undermines Plaintiff's case for discrimination based on pregnancy, the existence of the Injured Coworker alone fails to paint a convincing mosaic of pregnancy discrimination. Plaintiff just needs more.

"A plaintiff may establish pretext indirectly by showing that an employer's proffered reason for its decision is unworthy of credence." *Landolfi*, 515 F. App'x at 834. "Under this analysis, courts must evaluate whether the plaintiff demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the proffered reason so that a reasonable factfinder could conclude that it is unworthy of credit." *Id*. Moreover, a court can infer discriminatory intent from the totality of the circumstances, including factors like: (1) the temporal proximity between the plaintiff's request and the defendant's denial; (2) inconsistencies between the employer's statements and actions; and (3) an employer's hostility toward people in the plaintiff's protected class. *See id*.

The only other probative factor that Plaintiff points to is the supposed "temporal proximity" between her accommodation request and Defendant's denial of her request. [Doc. 33, pp. 6, 8]. As a refresher, internal emails between Defendants' employees from March 18, 2021, show that they had determined that they were "unable to accommodate [Plaintiff's] restrictions by allowing [her] to work" and would instead "accommodate [her] with an available leave program." [Doc. 33-8, p. 1]. But Plaintiff only had leave

lasting her through a few more days, until March 31, 2021. [*Id*. at pp. 105:16–106:10];

[Doc. 31-11, p. 10]. Although Plaintiff had shown up to work several times and was sent

home due to her restrictions, on May 10, 2021, Defendant formally terminated her for

failure to return from leave. *See* [Doc. 33-9, p. 1]; [Doc. 31-13, p. 2].

According to Plaintiff, the quick turnaround between her request and

Defendant's denial shows that Defendant failed to "explore the universe of

reasonable accommodations." [*Id*. at p. 8 (quoting *Owens v. Governor's Off. of Student

Achievement*, 52 F.4th 1327, 1335 (11th Cir. 2022), *cert. denied sub nom. Owens v. Georgia

Governor's Off. of Student Achievement*, 143 S. Ct. 2465, 216 L. Ed. 2d 434 (2023)

("[W]hen an employee triggers an employer's accommodation duties, the employer

must expend time and expense to explore the universe of reasonable

accommodations, identify one that is mutually agreeable to the parties, and

implement it."))]. Plaintiff contends that Defendant failed to engage in this

"interactive process" with her, failing to try at all to accommodate her work

restrictions and instead simply outright denying her request. [Doc. 33, p. 8 (citing

*Owens*, 52 F.4th at 1335)].

However, Defendant clearly considered her requests between March 1 and

March 18, nearly three weeks. The Court is not convinced Defendant needed more

than those 19 days to engage in an interactive process, considering the considerable

restrictions that Plaintiff's doctor prescribed that greatly (or completely) hampered

her ability to do her job. Plaintiff failed to show that she requested a *reasonable* accommodation that would have allowed her, not her teammates, to do her job.

Although Plaintiff argues that she could have worked if she'd been allowed to work exclusively on the third floor, again, such accommodation would have necessarily required putting the burden on other employees to stay longer on the floors that required lifting heavier items. [Doc. 31-2, p. 19]. Although Plaintiff stated in her deposition that she would have ignored her doctor's restriction regarding working a full 10-hour shift, the doctor's note she delivered to HR plainly stated that she shouldn't work more than eight hours *See* [Doc. 32-2, p. 31:21–32:5]. And, most detrimental to Plaintiff, she points to no evidence in the record that she ever communicated her intent to only follow some of her medical restrictions to Defendant.[15]

Moreover, the GWW Job Description explicitly states that the job involves "*[c]ontinuous* lifting of merchandise up to 65 pounds *on a regular basis*, and *occasional*

---

[15] On that note, the Court is unsure that all of Plaintiff's requested accommodations were "reasonable" considering that they apparently were not necessary to allow her to continue to work. Plaintiff effectively argues that Defendant discriminated against her by not accommodating her in ways that she apparently neither needed nor intended to follow. Moreover, the Court understands how Defendant could find it difficult to engage in an interactive process with an employee who never told Defendant what she truly needed as an accommodation. Nothing in the record shows that Plaintiff ever told Defendant that she would be willing to ignore her doctor's advice to limit herself to eight-hour shifts. Once Defendant informed her that it could not reasonably accommodate her medical limitations, that would have been an opportune time to tell Defendant that she would have been willing to work 10-hour shifts. Of course, that might not have ultimately carried the day for her, but it takes both sides to engage in a good-faith, interactive process. An employee can't be willing to dispense with medical limitations, never tell her employer and then blame her employer for not offering what she ultimately would have taken.

team lifting of merchandise up to 85lbs." [Doc. 31-4 (emphases added)]. In other words, Plaintiff's restrictions plainly disqualified her from performing the essence of the GWW job. To be sure, the Injured Coworker shows that Defendant may have allowed at least one non-pregnant GWW with some medical restrictions to work exclusively on the third floor where there were lighter loads for up to three months. However, Plaintiff simply failed to offer enough evidence about the Injured Coworker's particular limitations to show the Court exactly how similar they really were. Without such specific evidence, the Court finds that Plaintiff has not assembled a convincing mosaic that would indicate that Defendant intentionally discriminated against Plaintiff because she was pregnant. And, the Pregnant Coworker undermines Plaintiff's argument that Defendant didn't allow Plaintiff's numerous accommodations *because of* her pregnancy, and there are no other probative factors weighing in favor of pregnancy discrimination.

The Court concludes that Plaintiff has not otherwise shown a convincing mosaic of circumstantial evidence that would allow a jury to determine that she was intentionally discriminated against because of her pregnancy. Nor has Plaintiff offered sufficient evidence that Defendant's proffered reasons for denying her requested accommodations were pretextual under the third step of *McDonnell Douglas.* Accordingly, the Court **GRANTS** summary judgment to Defendant on Plaintiff's pregnancy discrimination claim.

2.  **Disability and Perceived-Disability Discrimination**

Plaintiff brings two claims under the ADA based on Defendant's allegedly discriminatory failure to accommodate her and her subsequent termination (Counts II and III). [Doc. 1, pp. 9, 11]. Count II alleges discrimination based on an actual disability, whereas Count III is based on a perceived disability. The same legal standard applies regardless of exactly how Defendant allegedly discriminated against her (i.e., whether by simply refusing to accommodate her, terminating her, or otherwise treating her disparately) and regardless of whether Plaintiff's disability was real or perceived, so the Court will discuss both in tandem. *See Kelly v. Wal-Mart Stores E., LP*, No. 3:18-CV-149-WKW-GMB, 2019 WL 1066065, at *10 (M.D. Ala. Feb. 15, 2019), *report and recommendation adopted*, No. 3:18-CV-149-WKW, 2019 WL 1061663 (M.D. Ala. Mar. 6, 2019); *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290 (11th Cir. 2002).

"Under the ADA, an employer may not discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000) (citing *Hillburn v. Murata Elec. N. Am., Inc.*, 181 F.3d 1220, 1226 (11th Cir. 1999)). To establish a prima facie case of disability discrimination under the ADA, Plaintiff must establish that she (1) was, or was perceived as, disabled; (2) was a qualified individual; and (3)

was discriminated against because of her alleged disability. *Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1255–56 (11th Cir. 2007); *Morisky v. Broward Cnty.*, 80 F.3d 445, 447 (11th Cir. 1996); *see Motorola, Inc.*, 303 F.3d at 1290 (applying the same standard to a perceived-disability discrimination case). As with the PDA, establishing a prima facie case is just one of multiple ways a plaintiff can survive summary judgment. She can also paint a "convincing mosaic" of circumstantial evidence that would allow a jury to infer intentional discrimination. *Akridge v. Alfa Ins. Companies*, 93 F.4th 1181, 1197 (11th Cir. 2024).

For reasons outlined in further detail below, the Court agrees with Plaintiff that she had a disability, but the Court agrees with Defendant that there is no dispute of material fact as to whether she was a qualified individual. Moreover, given that Plaintiff was unqualified for the position, there is no further evidence supporting a convincing mosaic of disability discrimination. Therefore, Defendant is entitled to summary judgment on Plaintiff's claims for disability and perceived-disability discrimination (Count II and III).

As for Count II (disability discrimination), Defendant contends that Plaintiff has not identified a disability and that, to the extent that Plaintiff is arguing that her pregnancy qualified her as disabled, her claim fails because pregnancy (in and of itself) cannot constitute a disability under the ADA. [Doc. 31-2, p. 14]. However, as Plaintiff points out, although "pregnancy is generally not considered a disability, a

pregnancy-related impairment may be considered a disability, if it substantially limits a major life activity." *Jeudy v. Att'y Gen., Dep't of Just.*, 482 F. App'x 517, 520 (11th Cir. 2012). And although Defendant is correct that Plaintiff testified that she did not consider herself to be "disabled," she also, in the same deposition, testified that she had been diagnosed with preeclampsia early on in her pregnancy.[16] *See* [Doc. 31-3, Gillan Depo., p. 3:6-11].

Defendants cite a case from the Western District of Virginia as supporting the proposition that "even if plaintiff was diagnosed with preeclampsia, plaintiff's ADA claim would fail because there is no evidence that she was limited in a major life activity." [Doc. 31-2, p. 15 (citing *Davidson v. Smyth Cnty. Sch. Bd.*, No. 1:20-CV-00007, 2022 WL 188186, at *9–10 (W.D. Va. Jan. 20, 2022))]. In *Davidson*, the defendant didn't know of any medical condition at the time of the adverse employment action and actually believed that the plaintiff was having a normal, healthy pregnancy while she was employed. 2022 WL 188186, at *2. The plaintiff's contract with the defendant employer was not renewed due to her poor job performance, and only after her employment ended, did she receive an official diagnosis of preeclampsia. *Id*. at *2–5, 9 (holding that although "[i]t is certainly the case that preeclampsia or chronic

---

[16] Gillan clarified in her Declaration that she associated the word "disabled" with "incapacitated." *See* [Doc. 32-3, Gillan Decl., ¶ 31]. Because the Court must construe reasonable inferences in favor of Plaintiff, the non-movant, the Court cannot construe Plaintiff as meaning to testify that she did not have preeclampsia. *See Flanders*, 752 F.3d at 1330.

hypertension are pregnancy-related complications that may qualify" as disabilities under the ADA, "the undisputed evidence shows that Davidson was not diagnosed with preeclampsia or hypertension until after the defendant decided not to renew her contract").

That is not quite the case here, where—viewing the evidence in the light most favorable to Plaintiff—Plaintiff received a preeclampsia diagnosis in early February 2021, Defendant denied her accommodation request in March 2021 and officially terminated her in May 2021. *See* [Doc. 32-3, Gillan Decl., ¶ 8]; [Doc. 31-3, Gillan Depo., pp. 3:6-11, 61:14-21, 75:21–76:8]; [Doc. 33-9, p. 1]; [Doc. 31-13, p. 2]. To be sure, there is no evidence in the record that Plaintiff told Defendant of her preeclampsia—just of her pregnancy—when asking for accommodations, but she at least communicated her specific medical restrictions to Defendant as early as February 26, 2021, unlike the plaintiff in *Davidson*. [Doc. 32-2, Gillan Depo., pp. 55:11–56:10]; *see Davidson*, 2022 WL 188186, at *2–5.

However, even assuming Plaintiff's preeclampsia constitutes a disability (the first element of an ADA claim), the Court disagrees that the evidence can satisfy the second element—that Plaintiff was a "qualified individual." *See Hilburn*, 181 F.3d at 1226. "A 'qualified individual with a disability' is an 'individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Davis v. Fla. Power*

*& Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000) (quoting 42 U.S.C. § 12111(8)). In its

Motion for Summary Judgment, Defendant argues that Plaintiff's accommodation

requests were not reasonable because they would have required "someone else

perform the essential functions of [her] job." [Doc. 31-2, pp. 18–19 (citing *Medearis v.*

*CVS Pharmacy*, 92 F. Supp. 3d 1294, 1308 (N.D. Ga. 2015))].

   In Response, Plaintiff argues that the GWW Job Description does not say that

lifting 85 pounds is an essential job function. *See* [Doc. 33, p. 12]. However, while

Plaintiff is correct that the Job Description only says that the job requires "*occasional*

team lifting of merchandise up to 85lbs," it also says "*continuous* lifting of

merchandise up to 65 pounds *on a regular basis*." [Doc. 32-7 (emphasis added)]. In

other words, repeatedly lifting up to 65 pounds is core to the GWW job—and that, via

her doctor's restrictions, she couldn't do. *See* [Doc. 31-3, Gillan Depo., pp. 7:19–8:1].

   Plaintiff additionally argues that Defendant could have accommodated her by

moving her to a different floor. [Doc. 33, pp. 13–14]. She had worked for extended

periods of time on the different floors, and therefore, according to Plaintiff, it

would've been reasonable to allow her to work solely on the third floor for the

duration of her pregnancy. [*Id*.]; *see* [Doc. 32-3, Gillan Decl., ¶¶ 22–24]. However,

Plaintiff admitted in her deposition that her coworkers ordinarily rotated to the third

floor and would have had to remain on the other floors if she remained there. [Doc.

32-2, Gillan Depo., pp. 25:15-23, 29:8-23, 32:14-21]. Such an accommodation would

amount to shifting essential functions of Plaintiff's job to other employees for over half a year. *See Medearis*, 92 F. Supp. 3d at 1308 (employer not obligated to accommodate plaintiff's disability by paying other employees to perform some of the essential functions of plaintiff's position); *Bivins v. Bruno's, Inc.*, 953 F. Supp. 1558, 1562 (M.D. Ga. 1997), *aff'd*, 247 F.3d 245 (11th Cir. 2001) (rejecting the plaintiff's argument that he could have handled the job as a stock clerk if given the "reasonable accommodation of a step stool and help from other employees on heavy items when the stock clerk position "consist[ed] almost entirely of lifting, reaching, carrying, pushing and pulling items, some of which are heavy and some of which are not").

Finally, Plaintiff argues that based on her experience of working no more than 10-hour shifts *and* the Job Description which says GWWs "[m]ay work continuously up to 12 hours," working a 12-hour shift was not essential to her job. [Doc. 32-3, Gillan Decl., ¶ 20]; [Doc. 31-4, p. 1 (emphasis added)]. The Court agrees that it seems working *12 hours* was not essential to her job. However, based off the same evidence, working *10 hours* was expected, essential and routine. Again, her medical restrictions limited her to no more than eight-hour shifts.

Bottom line: With the medical restrictions of a 35-pound lift limit with an eight-hour shift maximum for a seven-month period, the Court finds that Plaintiff could not perform the essential functions of her job. Additionally, the Court finds her requested accommodations would have necessarily forced her teammates to perform

some of the essential functions of Plaintiff's job by being forced to work longer shifts. Accordingly, Plaintiff's evidence cannot and does not support the second and third elements of a prima facie case of disability discrimination or otherwise paint a convincing mosaic of disability discrimination. The Court **DISMISSES** Counts II and III.

### 3. Retaliation

Plaintiff's last claim is for retaliation (Count IV).[17] [Doc. 1, p. 12]. A retaliation analysis begins with establishing a *McDonnell Douglas* prima facie case. *Freeland v. HR Synergies LLC*, 508 F. Supp. 3d 1351, 1364 (M.D. Ga. 2020); *Long v. Alabama Dep't of Hum. Res.*, 650 F. App'x 957, 968 (11th Cir. 2016). Once the prima facie case is established, the employer must proffer a legitimate, non-retaliatory reason for the adverse employment action. *Gogel v. Kia Motors Mfg. Grp. of Ga., Inc.*, 967 F.3d 1121, 1134–35 (11th Cir. 2020). If the defendant does so, the presumption is rebutted, and the plaintiff must then demonstrate that the proffered reason was a mere pretext masking a retaliatory action. *Id.* at 1135. Again, "[a]lthough [courts] often find it to be useful, [the Eleventh Circuit] has recognized that the *McDonnell Douglas* framework 'is not the exclusive means' of prevailing on a Title VII claim based on circumstantial

---

[17] Plaintiff brings this claim generally under Title VII and does not specify whether it is a claim for retaliation based on her asking for an accommodation for her pregnancy or for her disability (preeclampsia). *See* [Doc. 1, p. 12]. As the Court will explain below, there is no evidence in the record that Defendant knew of Plaintiff's preeclampsia diagnosis at the time she was terminated, so her retaliation claim could only possibly be based on asking for an accommodation for her pregnancy.

evidence." *Long v. Alabama Dep't of Hum. Res.*, 650 F. App'x 957, 968 (11th Cir. 2016) (quoting *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 n. 3 (11th Cir. 2005)). Plaintiff could also paint a convincing mosaic of retaliation. *See Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1342 (11th Cir. 2023) (applying the convincing mosaic standard in a retaliation case).

But let's start with the prima facie case. In order to establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in statutorily protected expression, (2) she suffered an adverse employment action, and (3) there was some causal connection between the two events.[18] *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016); *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994); *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008). Defendant does not dispute the second prong of a retaliation claim—that there was an adverse employment action—but rather, argues that Gillan cannot satisfy the first element because she did not complain about discrimination and thus, cannot satisfy the third element because there can't be a "causal connection" between one thing that did take place and another thing that didn't take place. *See* [Doc. 31-2, p. 24 (arguing that "there is no causal connection whatsoever . . . between Gillan's unknown protected

---

[18] Importantly here, since Plaintiff cannot establish an underlying claim of discrimination, a plaintiff "need not prove the underlying claim of discrimination which led to her protest." *Tipton v. Canadian Imperial Bank of Com.*, 872 F.2d 1491, 1494 (11th Cir. 1989). However, the plaintiff must have had "a reasonable good faith belief that the discrimination in fact existed." *Id*.

activity and the separation of her employment")]. The Court disagrees with

Defendant on the first element but agrees on the third.

As to the first element, Defendant argues that Plaintiff did not engage in

statutorily protected activity because there is no mention in Plaintiff's deposition or

anywhere else in the record that Plaintiff complained of discrimination when asking

for an accommodation. [Doc. 31-2, pp. 24–25]. However, as Plaintiff points out,

"[u]nder the ADA, the 'first element may be met by a request for a reasonable

accommodation.'" [Doc. 33, p. 18 (quoting *Gee*, 818 F.3d at 1258)]. Here, Plaintiff

informed Roblejo, her direct supervisor's supervisor, of her restrictions after her

initial visit with Dr. Mameli on February 26, 2021. *See* [Doc. 32-2, Gillan Depo., pp.

55:11–56:10]. To be sure, there is no evidence that she informed Defendant of her

preeclampsia—only her pregnancy. *See* [*id*.]. Therefore, based on the available

evidence, Defendant could have only *possibly* retaliated for Plaintiff complaining

about discrimination because of her pregnancy, not her disability (preeclampsia).

Nevertheless, giving the Plaintiff the benefit of the doubt, the Court finds that a

reasonable jury could determine that Plaintiff has met the first element by requesting

an accommodation due to her pregnancy.

Now onto the question of whether there is a causal connection between

Plaintiff requesting an accommodation and her termination. In 2013, the Supreme

Court clarified a plaintiff's burden on this element, holding that a plaintiff has to

"establish that his or her protected activity was a but-for cause [and not just a motivating factor] of the alleged adverse employment action by the employer." *University of Texas Southwestern Med. v. Nassar*, 570 U.S. 338, 362 (2013). Although this is a high bar, a plaintiff can still show but-for causation in the absence of direct evidence by pointing to temporal proximity between the protected action and the retaliatory action. *See Long*, 650 F. App'x at 968; *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007); *Shaling v. UPS Ground Freight*, 202 F. Supp. 3d 1283, 1294 (N.D. Ala. 2016). "It is well-established that for temporal proximity to provide the basis for causation, the protected action and the alleged retaliatory conduct must occur within a 'very close' time span." *Shaling*, 202 F. Supp. 3d at 1294 (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). Here, Plaintiff first alerted her supervisors and HR of her pregnancy and medical restrictions on March 1, 2021. [Doc. 32-2, Gillan Depo., pp. 55:18–56:10]. She formally requested leave on March 1, 2021, was granted leave until she exhausted it, and was eventually formally terminated on or about May 10, 2021. [Doc. 32-9, p. 1].

In other contexts, with different fact patterns, three months has been found too long to support a prima facie case of retaliation. *See, e.g.*, *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361 (11th Cir. 2007) (holding that a three-month disparity between the plaintiff complaining of sexual harassment and her termination did not rise to the level of "very close" in time to support causation). However, here, the undisputed

33

facts show that Defendant terminated Plaintiff because she could not perform the essential functions of her job given her medical restrictions. *See* [Doc. 31-13 (emails between Defendant's employees showing that Defendant was "not able to extend her leave" and that she was terminated but eligible for rehire)]. Given this admission, the Court finds the temporal proximity between her accommodations request and her termination sufficiently close in time to permit an inference of causation.

But as we know by now, the story doesn't end with Plaintiff establishing a prima facie case. Defendant still has a chance to rebut the presumption by offering a non-discriminatory reason for its decision. *See Gogel*, 967 F.3d at 1135. And again, this is an "exceedingly light" burden of *production*, not of proof. *Walker*, 53 F.3d at 1556. At trial, Plaintiff must still "prove through presentation of a preponderance of the evidence that the employer had a discriminatory intent." *Id.*

Although the evidence is clear and Defendant admits that it terminated Plaintiff because it could not accommodate her specific medical restrictions, this is not necessarily discriminatory if the requested accommodation is unreasonable. And as explained earlier in this Order, Plaintiff's requested accommodations were not reasonable given Plaintiff's job requirements. *See supra* Part 2. Aside from the semi-close proximity between Plaintiff's accommodations request and termination, there is no evidence to suggest that Plaintiff was terminated *because* she requested an accommodation. Rather, the evidence undisputably shows that Defendant considered

Plaintiff's accommodation request and simply couldn't grant it without putting a burden on other employees for an unreasonable amount of time. *See* [Doc. 31-3, Gillan Depo., pp. 73:13–74:23 (Plaintiff admitting that if her restrictions were accommodated, her coworkers would have to lift more heavier items and work longer or do more work)]. Thus, Defendant has met its burden of pointing to undisputed evidence that its reason for terminating Plaintiff is a legitimate, non-retaliatory explanation for the defendant's decision to terminate the plaintiff's employment. *See Robinson v. Michelin N. Am.*, Inc., No. 1:16-CV-00656-SRW, 2018 WL 6331694, at *4 n.7 (M.D. Ala. Dec. 4, 2018); *Landolfi*, 515 F. App'x at 834.

Now that Defendant has satisfied its burden of production, the burden shifts back to Plaintiff to come forward with evidence sufficient to permit a reasonable factfinder to conclude that Defendant's stated reasons were not the real reasons for her termination, but merely pretext for retaliation. *See Robinson*, 2018 WL 6331694, at *4 n.7. "Plaintiff cannot demonstrate pretext unless she shows both that the reasons were false and that retaliation was the real reason." *Id*. She must show "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions." *Gogel*, 967 F.3d at 1336.

However, aside from the slight temporal proximity, there is no other evidence of discriminatory intent or pretext. In fact, again, the existence of the Pregnant Coworker (and the Injured Coworker for that matter) undermines Plaintiff's claim.

As Defendant points out, "[i]n comparing herself to two coworkers whom she contends were accommodated with third floor work assignments, however, those comparators would necessarily have engaged in the same alleged protected activity by seeking accommodation of their own conditions." [Doc. 34, p. 3]. Accordingly, "[i]t does not follow that Plaintiff was retaliated against for seeking an accommodation when her comparators would have been in the same protected class of individuals who sought workplace accommodations." [*Id.*].

Nor does the Court find this slim evidence sufficient to paint a convincing mosaic of discrimination. If, for example, there were evidence that Plaintiff's supervisors made, encouraged or tolerated snide comments about Plaintiff's accommodations request, then, maybe, there'd be enough to send the question to a jury. *See Shaling*, 202 F. Supp. 3d at 1294 (permitting a finding of causation where there was temporal proximity *and* one of the plaintiff's managers had yelled at the plaintiff for filing grievances). But there is no evidence that anyone in the Defendant company was upset with Plaintiff for requesting the accommodation or for requesting leave.

This case simply does not fit into the paradigm for a retaliation case. Plaintiff asked for an accommodation which would have required adjusting the essential functions of her job for over seven months. *See supra* Part 1. After a couple weeks considering her request and after Plaintiff had exhausted her leave, Defendant denied

her request and terminated her when she could not return to work without the restrictions. *See* [Doc. 33-8, p. 1]; [Doc. 33-9, p. 1]; [Doc. 31-13, p. 2]. As the evidence does not permit a reasonable jury to make a finding of pretext or a convincing mosaic of unlawful retaliation, Defendant is entitled to judgment as a matter of law. Accordingly, Plaintiff's retaliation claim (Count IV) is **DISMISSED**.

## CONCLUSION

In sum, because the evidence does not permit a reasonable jury to make a finding of pregnancy discrimination, disability or perceived-disability discrimination, or retaliation, the Court **GRANTS** Defendant's Motion for Summary Judgment [Doc. 31] and **DISMISSES** Plaintiff's claims. The Clerk will enter **JUDGMENT** accordingly and close the case.

**SO ORDERED**, this 9th day of August, 2024.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**